UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:25-cv-21117-LEIBOWITZ

MARIELA MARQUEZ RODRIGUEZ,

*Plaintiff,*

v.

LELAND DUDEK, ACTING COMM'R,
SOCIAL SECURITY ADMINISTRATION,

*Defendant.*
_____/

## MEMORANDUM OPINION AND ORDER

In this Social Security appeal pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final determination of the Commissioner of the Social Security Administration ("SSA"), denying Plaintiff's application for a period of disability and Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") as well as Plaintiff's application for Supplemental Security Income ("SSI") pursuant to Title XVI of the Act. After consideration of the entire record, the decision of the Commissioner is **REVERSED**, and this case is **REMANDED** solely for calculation and payment of benefits.

## I.     PROCEDURAL HISTORY

Plaintiff applied for a period of disability, disability insurance benefits, and supplemental security income, alleging an onset date of August 22, 2019. (ECF No. 12, Transcript, hereinafter "Tr." at 232–237; 238–245).[1] The SSA denied Plaintiff's application at the initial level and on

_____

[1]      Because Plaintiff's claims for disability were filed after March 27, 2017, "the SSA's new regulations apply." *Matos v. Comm'r of Soc. Sec.,* No. 21-11764, 2022 WL 97144, at *4 (11th Cir. Jan. 10, 2022) (citing 20 C.F.R. § 404.1520c). "This new regulatory scheme no longer requires the ALJ to either assign more weight to medical opinions from a claimant's treating source or explain why good cause exists to disregard the treating source's opinion. Under the new regulations, an ALJ should focus on the persuasiveness of medical opinions and prior administrative medical findings by looking at five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors." *Id.* (citing 20 C.F.R. § 404.1520c(c)(1)–(5).

reconsideration. (*See* Tr. at 124–127; 128–130; 138–143; 144–149). Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 1, 2021. (*See* Tr. at 36–57). On March 12, 2021, the ALJ issued a written decision, finding Plaintiff "not disabled" within the meaning of the Act. (*See* Tr. at 12–30). On June 2, 2021, the Appeals Council affirmed the ALJ's decision. (*See* Tr. at 1–6). Thereafter, Plaintiff sought judicial review in this Court by filing a civil action, *Mariela Marques Rodriguez v. Comm'r, Soc. Sec.*, No. 1:21-cv-22170-Williams/Sanchez (S.D. Fla. June 11, 2021). This Court remanded the case under sentence four of 42 U.S.C. § 405(g), ruling in pertinent part that the ALJ's residual function capacity ("RFC") determination was not supported by substantial evidence because the ALJ failed to resolve the conflict in the evidence regarding Plaintiff's mental health impairments. (*See* Tr. at 679–694).

The Appeals Council then vacated the Commissioner's final decision and remanded the case to an ALJ for further proceedings consistent with the Order of this Court. (Tr. at 697). After a hearing held on December 12, 2023 (*see* Tr. at 634–653), the ALJ issued a decision on January 30, 2024, finding, once again, Plaintiff was not disabled within the meaning of the Act (*see* Tr. at 606–627). Plaintiff filed written exceptions, and the Appeals Council declined to assume jurisdiction. (Tr. at 596–599; 799–809). Thus, the final decision of the Commissioner on remand is now ripe for review under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     LEGAL FRAMEWORK

To qualify for Social Security benefits, a claimant must show that she is disabled. *See Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); 20 C.F.R. §§ 404.1512(a), 416.912(a). The Social Security Act defines "disability" as the "inability to

2

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

A disability benefits claim follows a multi-layered process before it can be reviewed in federal district court. A claimant first applies to a state agency for disability determinations, 42 U.S.C. § 421(a), after which the claimant is entitled to an evidentiary hearing before an Administrative Law Judge ("ALJ"). *See Heckler v. Day*, 467 U.S. 104, 106–07 (1984). An ALJ must perform a "five-step sequential evaluation" to determine if a claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(1) (setting forth five-step process detailed below). A claimant may appeal an ALJ's unfavorable decision to an Appeals Council that must review the case and determine if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." *See Heckler*, 467 U.S. at 106–07; 20 C.F.R. § 404.970(a).

The governing regulations provide that the Social Security Administration must conduct its "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 404.900(b). Unlike judicial proceedings, social security administrative hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id.* Indeed, "at the hearing stage, the Commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record.

This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id.* (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

### A.      Burdens of Proof and the ALJ's Sequential Analysis

In making the disability determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under this process, the ALJ must determine sequentially: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a Listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must assess the claimant's Residual Functional Capacity ("RFC"). RFC is defined as "the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In making the RFC assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of the analysis. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

The claimant bears the burden of proof at the first four steps of the sequential process. *See Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1278 (11th Cir. 2020). If the claimant establishes the first four steps, then the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy that the claimant can perform. *See Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1321 (11th Cir. 2021). If the Commissioner carries his burden, then the claimant must prove that she cannot perform the work identified by the Commissioner. *See Goode*, 966 F.3d at 1279.

**B.**   <u>**District Court Review**</u>

After completing the administrative process, a claimant may seek review in federal court.  42 U.S.C. § 405(g); *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007).  The scope of review at the district court level is limited to determining if (1) substantial evidence supports the Commissioner's findings, and (2) the correct legal standards were applied.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)).  To make this determination, a reviewing court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.* (citations omitted).

In testing for substantial evidence, a court may not "reweigh the evidence" or "decide the facts anew."  *Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1178 (11th Cir. 2011).  Instead, so long as the ALJ's findings are supported by substantial evidence, they are conclusive and the court must defer to the ALJ's decision even if the evidence preponderates against it.  *See Crawford*, 363 F.3d at 1158–59.  However, the court will not "merely rubber-stamp a decision ... [and] must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1257 (11th Cir. 2019) (citation omitted) (cleaned up); *see also Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1104 (11th Cir. 2021) ("Within this narrowly limited role, however, the federal courts 'do not act as automatons' ... '[w]e retain an important duty to 'scrutinize the record as a whole' and determine whether the agency's decision was reasonable") (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).  Remand is appropriate for further factual development where the record reveals evidentiary gaps that result in unfairness or clear

prejudice.  *See Washington,* 906 F.3d at 1358 (citing *Henry v. Comm'r of Soc. Sec.,* 802 F.3d 1264, 1267 (11th Cir. 2015)).

A reviewing court is also required to review the ALJ's decision to determine if the correct legal standards were applied.  *See Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997).  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide sufficient reasoning for determining that the proper legal analysis has been conducted, then the ALJ's decision must be reversed.  *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

A court reviewing a Social Security benefits determination is granted the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing."  42 U.S.C. § 405(g).  If "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the appropriate remedy is to remand solely "for calculation and payment of benefits."  *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).  If, however, there is reason to believe "a more complete record might support the Commissioner's decision," the court should remand for further proceedings.  *See Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999).

## III.   VOCATIONAL EXPERT'S TESTIMONY

On remand, the ALJ held a hearing on December 12, 2023, at which a Vocational Expert ("VE") testified.  (*See* Tr. at 634–653).  The ALJ posed two hypothetical scenarios to the VE to determine what jobs Plaintiff could perform given her medically determinable impairments.  The first hypothetical scenario did not take into account any limitations due to Plaintiff's mental impairments. (Tr. at 649).  In response to that hypothetical scenario, the VE testified that such an individual could perform work as a Laundry Classifier, Photocopy Machine Operator, and Marker—precisely the jobs available in the national economy that the ALJ later determined Plaintiff could perform when finding

her not disabled.  (*See* Tr. at 649–650; 627).  The second hypothetical considered Plaintiff's mental impairments as follows:

> The individual would be subject to the same limitations as hypo #1, but this individual would be off task 15% or more in an eight-hour workday or miss two or more days per month due to psychologically based symptoms.  Can that individual perform any work in the nation economy?

(Tr. at 650).  The VE responded, "No competitive employment, Your Honor, no."  (*Id.*).

## IV.    THE ALJ'S DECISION ON REMAND

On remand, the ALJ expounded upon its prior discussion of Plaintiff's mental impairments, but nevertheless largely made the same findings that were made in the original proceedings during the five-step sequential process.  (*Compare* Tr. at 606–627 *with* Tr. at 15–25).[2]   At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since August 22, 2019, the alleged onset date.  (Tr. at 608; Tr. at 17–18).  20 C.F.R. § 404.1571 *et seq.*; 20 C.F.R. § 416.971 *et seq.*  At step two, the ALJ found Plaintiff suffered from the following "severe" impairments: "depression, anxiety, bipolar disorder, disorders of the spine, left foot plantar faciitis, and obesity."  (Tr. at 608; Tr. at 18 (finding Plaintiff suffered from "the following severe impairments:  spine disorder; major depressive disorder; and generalized anxiety disorder")).  20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).  At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. at 610–614; Tr. at 18–26).  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526; 20 C.F.R. § 416.920(d), Subpart P, Appendix 1.

In assessing the severity of Plaintiff's mental impairments in accordance with the "paragraph B" criteria, the ALJ concluded Plaintiff had "moderate" limitations in three domains—(1)

---

[2]     As Plaintiff also applied for SSI, the ALJ determined she met the insured status requirements of the Social Security Act through December 31, 2023.  (Tr. at 608; Tr. at 17).

"understanding, remembering, or applying information;" (2) "interacting with others;" and (3) "concentration, persistence, or pace." (Tr. at 612–613; Tr. at 18–19). The ALJ determined Plaintiff had only "mild" limitations in the domain of "adapting or managing oneself." (Tr. at 613; *see* Tr. at 19 (finding "moderate" limitations in this domain)).

The ALJ further found that "the evidence fails to establish the presence of the 'paragraph C' criteria." (Tr. at 613; Tr. at 19–20). Specifically, the ALJ determined the "record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." (Tr. at 613; *see* Tr. at 19). The ALJ reasoned that "the claimant's symptoms were generally controlled with medication and there is generally no showing that she lacked the ability to adjust or had a minimal capacity to adapt to changes and she did activities like caring for her elderly father…." (Tr. at 613). Accordingly, the ALJ found "nothing in the evidence of record that supports a finding that the claimant meets the requirements of 'paragraph C.' Moreover, the claimant generally does not exhibit all of the requirements of the paragraph A criteria on a sufficient basis to meet the listing in combination with the 'paragraph C' criteria." (*Id.* at 613–614; *see* Tr. at 19–20).

Before assessing Plaintiff's RFC, the ALJ explained as follows:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(Tr. at 614; Tr. at 20).

According to the ALJ, Plaintiff has the RFC to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), except that:

> [Plaintiff] can frequently kneel, crouch, crawl, stoop, and balance; can frequently climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can never be exposed to

> unprotected heights or hazards; can follow simple instructions; can concentrate in two hour increments without a break; and can occasionally interact with coworkers, supervisors, and the public.

(Tr. at 614; *see* Tr. at 20 ("claimant has the residual functioning capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can perform frequent postural activities but no climbing scaffolds, ladders or ropes and no exposure to hazards. The claimant can perform simple, routine, repetitive tasks (3 step, reasoning level 2); no more than two hours of concentration without a break; only occasional contact with coworkers, supervisors, and the public; and infrequent changes that are gradually introduced")).

At step four, the ALJ concluded Plaintiff could not perform any of her "past relevant work" based upon the VE's testimony that she could not. (Tr. at 626; Tr. at 23). 20 C.F.R. §§ 404.1565 and 416.965. Prior to proceeding to step five, the ALJ made three findings. First, the claimant was 43 years old, defined as a "younger individual" on the alleged disability onset date. (Tr. at 626; Tr. at 24). 20 C.F.R. §§ 404.1536 and 416.963. Second, the claimant had at least a high school education. (Tr. at 626; Tr. at 24). 20 C.F.R. §§ 404.1564 and 416.964. And third, transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the claimant was "not disabled," whether or not the claimant has transferable job skills. (Tr. at 626; Tr. at 24). *See* SSR 82-41 and 20 C.F.R. § 404, Subpart P, Appendix 2.

Lastly, at step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff can perform such as Laundry Classifier, Photocopying Machine Operator, and Marker. (Tr. 626–627; *see* Tr. at 24–25 (finding Plaintiff had the RFC to perform light work as Marker 2, Routing Clerk, and Housekeeping Cleaner)).

Thus, the ALJ concluded Plaintiff had not been under a disability, as defined by the Act, from the alleged onset date of August 22, 2019, through the date of decision.  (Tr. at 627; Tr. at 25).  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## V.      ISSUES ON APPEAL

Plaintiff challenges the ALJ's "not disabled" determination chiefly on the ground that the ALJ's RFC finding is not supported by substantial evidence because the ALJ did not sufficiently account for Plaintiff's mental impairments when determining Plaintiff's RFC.  [ECF No. 17 at 6–23].  In particular, Plaintiff contends the "ALJ failed to properly assess the clinical findings of [her] long-term treating psychiatrist, Howard Pratt, D.O., as well as the totality of the evidence pertaining to [her] mental health conditions."  [*See id.* at 6–18].  Plaintiff further argues the ALJ's RFC assessment is deficient because neither the RFC nor the ALJ's hypothetical scenarios to the VE "t[ook] into account even the portion of the State agency psychologist's opinion that [the ALJ] found 'persuasive'"—more specifically, that Plaintiff needed "assistance obtaining employment"; Plaintiff was unable "to always respond appropriately to criticism from supervisors"; and Plaintiff was unable "to always maintain socially appropriate behavior (especially since she is distrustful of others, experiences hallucinations, and is an admitted practitioner of Santeria)."  [*Id.* at 24].

The Commissioner responds that substantial evidence supported the ALJ's RFC assessment as well as the ALJ's evaluation of Plaintiff's subjective complaints.  [ECF No. 22 at 4–14].  Further, the Commissioner argues the ALJ properly considered the state agency psychological consultant's prior administrative medical findings.  [*Id.* at 14–18].

The parties' arguments hinge on the ALJ's assessment of Plaintiff's claimed mental impairments.  The undersigned has scrutinized the entire administrative record—with special attention to the objective medical evidence.  Below, the Court discusses the relevant portions of the record as needed to address the issues presented on appeal.

**A.  The ALJ's Assessment of Plaintiff's Mental Impairments.**

The ALJ applied the appropriate two-step process to assess Plaintiff's RFC in light of her "severe" mental impairments—depression, general anxiety, and bipolar disorder.  (Tr. at 614–625). First, the ALJ evaluated whether there is an underlying mental impairment that can be shown by medically acceptable clinical or laboratory diagnostic techniques that could reasonably be expected to produce the Plaintiff's pain or other symptoms.  (Tr. at 614–615).  After careful consideration of the evidence, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]"  (Tr. at 615).  Thus, the ALJ proceeded to the second step to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit claimant's work-related activities."  (*See* Tr. at 614–625).

1.     "Intensity, Persistence, and Limiting Effects" Evidence.

At the second step, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. at 615).  Here, the ALJ found "the medical evidence of record strongly supports that the claimant is able to perform work consistent with the [RFC] as evidenced by objective examination findings, mental status examination findings, and the claimant's high functioning activities of daily living, being independent with self-care, and caring for her elderly parent[.]"  (Tr. at 615).  The evidence relied upon by the ALJ in support of these findings is summarized (by category, and in relevant part) as follows:

(i)     *Medical records from Plaintiff's treating psychiatrists.*

•     On August 23, 2019, the claimant reported for a voluntary psychiatric hospitalization due to feeling suicidal after the death of a loved one resulting in paranoia, subsequent hallucinations, and suicidal ideation.  On mental status examination at admission, the claimant was found to have substantial findings and diagnosed with generalized anxiety disorder and major depressive disorder, single episode, severe without psychotic features. (Exhibits 4F/6-11; 5F/30-35).  On objective examination, the claimant was found to be alert, no acute distress, oriented, cooperative, conversant, able to understand instructions, able to make decisions, and

have no focal neurological deficits.  The claimant also reported she ingested 15 Tylenol five days prior.  **The claimant was then discharged to a crisis stabilization unit with diagnoses of suicidal ideation and depression.** (Tr. at 615).

- On August 25, 2019, the claimant was discharged from psychiatric hospitalization, where she was found to be feeling much better since beginning treatment, being able to sleep, feeling refreshed, and that she did not have suicidal ideations, intent, or plan.  The claimant also denied any auditory or visual hallucinations as they stopped with the medications.  At discharge, she was prescribed with 100 milligrams of Seroquel.  On objective mental status examination at discharge, the claimant was found to be alert, neatly dressed, appropriate behavior, essentially normal speech, euthymic mood/affect, organize thought process, denied hallucinations, logical thought content, denied suicidal or homicidal ideation, and intact concentration, recent memory, abstraction capacity, insight, and judgment. (Exhibits 4F/3-5; 5F/22-29). (Tr. at 615).

- On August 30, 2019, the claimant was found to have a PHQ-9[3] score of 27 indicating clinically significant symptoms. (Exhibit 4F/2). (Tr. at 615).

- On September 30, 2019, psychiatrist Howard Pratt, DO, found that the claimant denied hallucinations, and was otherwise essentially normal except for an anxious mood, distracted/inattentive with memory/concentration, and reactive and mood congruent affect. He then diagnosed the claimant with major depressive disorder severe without psychotic symptoms, and generalized anxiety disorder while prescribing quetiapine 300 mg and benztropine 1 mg. (Exhibits 5F/19-21; 6F/23-25). (Tr. at 616).

- On October 16, 2019, Dr. Pratt found that the claimant was essentially normal except for an anxious mood and a distracted/inattentive memory/concentration. (Exhibits 5F/16-18; 6F/20-22). (Tr. at 616).

- On November 11, 2019, Dr. Pratt found that the claimant was clinically stable with no hallucinations and was essentially normal except for an elevated mood and problems with impulse control. He then continued the claimant's medications and added sertraline 50 mg and quetiapine 400 mg. (Exhibits 5F/13-15; 6F/17-19). (Tr. at 616).

- On November 18, 2019, Dr. Pratt found that the claimant was again essentially normal except for being distracted/inattentive. He then continued the claimant's previously prescribed medications. (Exhibits 5F/10-12; 6F/14-16). (Tr. at 616).

- On December 13, 2019, Dr. Pratt found that the claimant reported things were going better over the past few weeks despite more stressors such as disagreements with her siblings over an inheritance. He then found that she was essentially normal except for distracted/inattentive while continuing her medications. (Exhibits 6F/2-4; 7F/10-12; 8F/27-29). (Tr. at 616).

- On January 6, 2020, Dr. Pratt found that the claimant reported that things were well since her last visit, that she spent her holidays with her family, and that she had no suicidal

---

[3]      PHQ-9 (Patient Health Questionnaire) is a severity measure for depression.  PHQ-9 scores range from 0-4 (none); 5-9 (mild); 10-14 (moderate); 15-19 (moderate severe); to 20-27 (severe).  *See Anderwood v. Comm'r of Soc. Security*, No. 9:23-CV-58-MAC, 2024 WL 3912950, at *1 (E.D. Tex. Aug. 22, 2024) ("'a PHQ-9 score is just one step in diagnosing and treating depression'") (quoting *Long v. Colvin*, No. CV 16-5089, 2017 WL 2889367, at *1 (E.D. La. July 7, 2017)).

ideation or hallucinations. He then increased the claimant's Zoloft to 75 milligrams after finding that she was essentially normal on mental status examination. (Exhibits 7F/1-3; 8F/19-21). (Tr. at 616).

• On February 11, 2020, Dr. Pratt found that the claimant complained of difficulty initiating and maintaining sleep and some difficulty maintaining her medication regimen. He again found that the claimant denied suicidal or homicidal ideation and continued her medications after finding that she was again essentially normal mentally. (Exhibits 8F/11-13; 9F/31-32). (Tr. at 616).

• On April 1, 2020, Dr. Pratt, and a medication management examination found that the claimant had a PHQ-9 of 17 but made no other objective examination findings and continued her medications. (Exhibit 9F/21-22). (Tr. at 616).

• On May 11, 2020, Dr. Pratt found that the claimant was doing well since her last visit with no suicidal ideation, no hallucinations, and that she was again essentially normal on mental status examination except for problems with impulse control. He then continued her medications. (Exhibit 9F/1-3). (Tr. at 616).

• On July 6, 2020, Dr. Pratt examined the claimant for medication management and found that the claimant had a pain score of zero, no complaints of pain, and a PHQ-9 of 3. (Exhibit 10F/5-7). (Tr. at 616).

• On August 28, 2020, and September 28, 2020, Dr. Pratt found that the claimant again reported things were well since her last visit, that she denied suicidal ideation, denied hallucinations, and that she was essentially normal in all aspects. (Exhibit 10F/10-13, 26-28). (Tr. at 616).

• On November 18, 2020, Dr. Pratt found that the claimant was stable and that she denied suicidal ideation or hallucinations. He again found that she was essentially normal mentally except for that she was distracted/inattentive. (Exhibit 10F/35-40). (Tr. at 616).

• On December 9, 2020, Dr. Pratt continued the claimant's medications at a medication management visit where he made no objective findings but noted that her PHQ-9 was 17. (Exhibit 11F/4-6). (Tr. at 616).

• On January 29, 2021, Dr. Pratt continued the claimant's medication management on where he also noted her PHQ-9 was 24. (Exhibit 11F/10-13). (Tr. at 617).

• On April 15, 2021, Dr. Pratt found that the claimant's PHQ-9 was zero while continuing her same medications. (Exhibit 11/20-22). (Tr. at 617).

• On July 26, 2021, for medication management, Dr. Pratt found that the claimant's PHQ-9 was 16 while continuing her medications in making no objective psychiatric findings. (Exhibit 11F/29-31). (Tr. at 617).

• On September 17, 2021, Dr. Pratt found that the claimant had a PHQ-9 score of zero at his medication management examination of the claimant where he also continued her medications while again making no psychiatric findings. (Exhibit 11F/34-36). (Tr. at 617).

• On October 25, 2021, Dr. Pratt continued the claimant's medications. (Exhibit 11F/41-43). (Tr. at 617).

• On January 31, 2022, Dr. Pratt continued the claimant's medications and found that she had a PHQ-9 score of zero. (Exhibit 11F/49-51). (Tr. at 617).

• On March 28, 2022, Dr. Pratt continued the claimant's medications while making no objective findings although he noted her PHQ-9 was 18. (Exhibit 11F/55-59). (Tr. at 617).

• On May 11, 2022, Dr. Pratt noted that the claimant had a past psychiatric history of bipolar disorder and found that she denied suicidal or homicidal ideation and that she denied

13

hallucinations. He then continued the claimant on the same medication regimen while finding that the claimant was essentially normal with regard to appearance, attitude, psychomotor behavior, speech, affect, mood, thought process, orientation, sensorium, memory and concentration, insight, and judgment. **He then diagnosed the claimant with bipolar disorder, recurrent episode mixed with severe, with psychotic features**. He then continued the claimant on Quetiapine 600 mg, sertraline 200 mg, and benzotropine 2 mg. (Exhibit 11F/83-94). (Tr. at 617 (emphasis added)).

- On July 1, 2022, Dr. Pratt found that the claimant again denied any suicidal ideation or hallucinations while finding that she was clinically stable and essentially normal on objective examination and continued her medications. (Exhibit 11F/107-119). (Tr. at 617).

- On October 24, 2022, Dr. Pratt found that the claimant again denied any suicidal or homicidal ideation, no hallucinations, and that she spent her birthday with her father. He then found that the claimant was essentially normal in all aspects including a euthymic mood, good insight, and good judgment. **He then diagnosed the claimant with bipolar disorder and continued her on benztropine 2 mg, quetiapine 300 mg, and sertraline 100 mg.** He then instructed the claimant to return in four weeks. (Exhibit 11F/151-163). (Tr. at 617 (emphasis added)).

- On February 1, 2023, psychiatrist Dang Tran, M.D., noted that the claimant had received no treatment since October 24, 2022, and that she had a past psychiatric history of bipolar disorder, PTSD, and schizophrenia. On objective examination, Dr. Tran found that the claimant was alert, oriented, no acute distress, cooperative, good eye contact, reported mood is anxious and depressed, labile affect, complaints that her current medications were no longer working and that she felt anxious and depressed for no reason with symptoms of poor sleep, appetite, and energy although she denied suicidal/homicidal ideations, and tension, or plan. **However, Dr. Tran found that the claimant had an elevated mood, was talkative, increased body movement with tangential thinking and that she endorsed auditory hallucinations and denied visual hallucinations, but reported feeling ghosts around.** He then continued the Zoloft 200 milligrams, increased the claimant's Seroquel to 800 milligrams, and started the claimant on Depakote 250 milligrams while stressing the importance of medication adherence and psychiatric follow-up. **He then diagnosed the claimant with bipolar disorder, unspecified and schizophrenia**. (Exhibit 11F/174-189). (Tr. at 617–618 (emphasis added)).

- On February 27, 2023, Dr. Pratt continued the claimant on her current medication regimen and found that she denied suicidal ideation and hallucinations. On objective examination, he found that the claimant was essentially normal in all aspects including a euthymic mood, intact memory, good insight, and good judgment. He also found that the claimant with stable and only diagnosed her with bipolar disorder. (Exhibit 11F/190-206). (Tr. at 618).

- On March 27, 2023, Dr. Pratt again found that the claimant was essentially normal on mental status examination and stable while continuing her medications. He then continued her medications except for the Depakote. (Exhibit 11F/208-223). (Tr. at 618).

- On April 27, 2023, Dr. Pratt found the claimant again denied any hallucinations or suicidal ideation and that she was clinically stable. On objective mental status examination, he again found that the claimant was essentially normal in all aspects including appearance, attitude, psychomotor, speech, affect, mood, thought process, perception, orientation, sensorium, memory and concentration, insight, and judgment. He then continued the

claimant's medications while diagnosing her with bipolar disorder. (Exhibit 11F/233-248). (Tr. at 618).

- On May 22, 2023, Dr. Pratt found that the claimant reported doing well and that she denied any suicidal ideation or hallucinations.  He again found that the claimant was clinically stable and again essentially normal in all aspects on mental status examination. He then continued her diagnosis of bipolar disorder and medications. (Exhibit 11F/256-271).  (Tr. at 618).

- On June 26, 2023, Dr. Pratt continued to find that the claimant was clinically stable without complaints of suicidal ideation or hallucinations and that she was again essentially normal mentally. He diagnosed the claimant with bipolar disorder and continued her medications. (Exhibit 11F/272-293).  (Tr. at 618).

- On July 24, 2023, Dr. Pratt again found that the claimant was essentially the same while continuing the bipolar disorder diagnoses and medications. (Exhibit 11F/295-309).  (Tr. at 618).

- Dr. Pratt, on August 21, 2023, again found that the claimant was essentially normal and that she did not complain of any suicidal ideation or hallucinations. The claimant also reported spending her birthday with her family. He then continued her bipolar disorder diagnoses and medications. (Exhibit 11F/320-342).  (Tr. at 618).

- On September 25, 2023, psychiatrist Luis Hiraldo, M.D., examined the claimant and found her to be calm, alert, oriented, cooperative, no acute, with a mood that she described as pretty much the same, and a congruent affect.  He also found that the claimant denied affect of symptoms, anxiety, irritability, impulsivity, perceptual disturbances, psychotic symptoms, or suicidal or homicidal thoughts.  He also found that the claimant endorsed preserved sleep and appetite and that she was compliant with medications without side effects.  He further found that the claimant did not show any effective or psychotic symptoms and the continued her medications as prescribed. He also found that the claimant's PHQ-2/9 scores were generally very low from October 2022 through August 2023 with scores no higher than two and eight, respectively.  On objective examination, he found that the claimant had no abnormal findings with regard to appearance, attitude, psychomotor, speech, affect, mood, thought process, perception, orientation, sensorium, memory, concentration, judgment, or insight. (Exhibit 11F/351-365).  (Tr. at 618).

- On October 23, 2023, Dr. Pratt again found that the claimant denied any hallucinations or suicidal ideation, and that she was again clinically stable. He then continued to find that the claimant was essentially normal on mental status examination objectively. However, he noted that the claimant had a PHQ-2 score of 5 and a PHQ-9 score of 24. He then again diagnosed the claimant with bipolar one disorder and continued her same medications. (Exhibit 1F/371-388).  (Tr. at 619).

(ii)     *Treatment notes from Plaintiff's psychiatric intern, therapists, and social workers.*

The ALJ acknowledged that treatment notes from a psychiatric intern is not an acceptable medical source.  (Tr. at 619).  Nevertheless, the ALJ reviewed Plaintiff's psychiatric intern's "contemporaneous notes" and determined they "do not demonstrate that the claimant is more limited that as assessed by the residual functional capacity finding[.]"  (*Id.*).  As for the medical records from

Plaintiff's psychiatric therapists and social workers, the ALJ found their findings "do not demonstrate that the claimant is more limited than as assessed by the residual functional capacity finding and are at least occasionally markedly inconsistent with the contemporaneous treatment notes of … Dr. Pratt." (Tr. at 619–620). The ALJ's assessment of these records are as follows:

- On May 12, 2022, Fred Thomas, MS, and Lisette Mira, LCSW, noted that the **claimant presented for bipolar,** that she was doing a lot better with medication, experiences no depression, anxiety, or panic attacks, and that **she considers auditory hallucinations as voices belonging to her friend.** On objective examination, she found that the claimant was essentially normal in all aspects. Later, **she indicated that despite taking the claimant's medications, the claimant complained of a depressed mood, anxiety, panic attacks, mood swings, and auditory hallucinations 3-4 days weekly.** (Exhibit 11F/71-83). (Tr. at 620 (emphasis added)).

- On June 27, 2022, Mr. Thomas found that the claimant had an unremarkable mental status examination as she was essentially normal although she complained of being anxious about being unemployed and difficulty dealing with a relative. (Exhibit 11F/97- 102). (Tr. at 620).

- On October 3, 2022, Mr. Thomas found that the claimant was essentially normal objectively, but noted **she complained that she experiences anxiety three to four days weekly, panic attacks four to five days weekly, and hears voices daily** (Exhibit 11F/123-129). (Tr. at 620 (emphasis added)).

- On October 24, 2022, social worker Anthony Urgent, noted that the claimant reported a barrier as her current unemployment status. At the same time, he also found that the claimant complies with her medications and that she does not report any current episodes or symptoms of irritable mood, distractibility, or racing thoughts. (Exhibit 11F/135-148). (Tr. at 620).

- On April 3, 2023, Mr. Thomas found that the claimant was essentially normal in all aspects objectively although she complained that she was frustrating dealing with her parents and that **she complained of symptoms like being depressed, anxious, angry, and hearing voices most days.** He also noted that the claimant reported that she mostly has no energy to do anything because she is busy taking care of her elderly and belligerent parent. (Exhibit 11F/225-230). (Tr. at 620).

- On April 27, 2023, Mr. Urgent found that the claimant was progressing with her goal of being clinically stable and continuing to report zero occurrences of symptoms. He also found that the claimant was reporting no suicidal ideation and did not report any current symptoms of irritable mood, distractibility, or racing thoughts. He also found that she was noncompliant with her goal of attending primary care appointments in the last six months. (Exhibit 11F/134, 249-255). (Tr. at 620).

- On August 21, 2023, Mr. Thomas found that the claimant was essentially normal mentally on objective examination although she complained of feeling depressed and anxious about three times a week. He also found that the claimant agreed to become more involved in social activities and that she likes the idea of taking class at a local college and continuing adult education. The therapist also suggested that the claimant should join a neighborhood

club or engage in other activities involving social interaction. (Exhibit 11F/311-319).  (Tr. at 620).

- On September 25, 2023, social worker Naivy Borges, BS noted that the claimant reported that she is progressing overall with no current effective symptoms, anxiety, irritability, impulsivity, perceptual disturbances, other psychotic symptoms, or suicidal or homicidal thoughts. (Exhibit 11F/343-349). (Tr. at 620).

*(iii)    Plaintiff's "high functioning" activities.*

The ALJ also considered evidence in the record of what the ALJ described as Plaintiff's "high

functioning" activities as follows:

- In April 2023, Mr. Thomas noted that the claimant reported that she mostly has no energy to do anything because she is busy taking care of her elderly and belligerent parent, as above.  (Exhibit 11F/225-230).
- The claimant previously reported that she can drive on her own, do chores around the house, cook, and clean when she feels up to it.  She previously reported managing money on her own, paying bills in stores, can complete transactions, driving alone, and get places on her own.  She previously reported taking care of her own hygiene independently daily.  She also previously reported doing activities like reading and talking to a few family members over the phone occasionally.  (Exhibit 4E).
- The claimant lives with her father. She has a driver's license. She testified she grocery shops about twice a month, warms meals, takes her parent to doctor's appointments, and cleans. (Hearing Testimony).
- The claimant testified that she attended college at Miami-Dade but could not remember.

(Tr. at 623) (cleaned up).

2.    ALJ's "Intensity, Persistence, and Limiting Effects" Analysis.

Based upon all the evidence described above, the ALJ concluded as follows:

Mental status examinations strongly support the claimant's ability perform work consistent with the residual functional capacity finding.  (Tr. at 623).  For instance, the claimant had a single voluntary psychiatric hospitalization at the beginning of her alleged period of disability following the unfortunate death of her sibling. (Exhibits 3F/3-14; 4F/6-11; 5F/30-35). (Tr. at 621).  However, **the claimant quickly recovered once stabilized on medication and was discharged after a few days with no hallucinations and an improvement in her mood**. (Exhibits 4F/3-5; 5F/22-29). (Tr. at 621 (emphasis added)).  Immediately following the hospitalization, the claimant's binary treating psychiatrist throughout the entire relevant period at issue, Dr. Pratt, **throughout the remainder of 2019 generally found that the claimant continually denied hallucinations and that she was generally essentially normal throughout most of her examinations with some waxing and waning of**

**symptoms**. (Exhibits 5F/10-21; 6F/2-4, 14-16, 20-25; 7F/10-12; 8F/27-29).  (Tr. at 621 (emphasis added))

**Throughout the entirety of 2020, Dr. Pratt generally found that she was again reporting that things were going well, that she had no hallucinations or suicidal ideation, and that she was essentially normal on objective examinations and generally made no medication changes despite having some variation in her reported symptoms by way of PHQ-9 scores from about 3 to 17**. (Exhibits 7F/1- 3; 8F/11-13, 19-21; 9F/1-3, 21-22, 31-32; 10F/5-7, 10-13, 26-28, 35-40; 11F/4-6).  (Tr. at 621–622 (emphasis added)).  **In multiple examinations in 2021 and 2022, Dr. Pratt again found that the claimant was essentially the same throughout every examination with no complaints of suicidal ideation, no hallucinations, and no significant positive psychiatric objective findings**. (Exhibits 11F/10-13, 20-22, 29-31, 34-36, 41-43, 55-59, 83-94, 107-119, 151-163). Tr. at 622 (emphasis added)).  The claimant's treating primary care providers, in April and June 2020, found that **she had no positive objective psychiatric findings other than her complaints and the PHQ-9 scores.** (Exhibits 9F/14-20; 10F/1-4).  (tr. at 622 (emphasis added)).

**It was not until an examination by Dr. Tran in February 2023 where he found that the claimant received no treatment since the October 2022 examination by Dr. Pratt that the claimant had any significant positive psychiatric findings**. (Exhibit 11F/174-189).   (Tr. at 622 (emphasis added)).  **However, not even one month later, once on her medications, Dr. Pratt again found that she was essentially normal objectively, that she was stable, and that she was otherwise essentially normal with no other significant complaints** like suicidal ideation or hallucinations, as above. (Exhibit 11F/190-206).  (Tr. at 622 (emphasis added)).

Mr. Urgent, in April 2023 found that the claimant was essentially normal with no complaints of symptoms which is generally consistent with the findings by Dr. Pratt, as above. (Exhibit 11F/134, 249-255).  (Tr. at 622).  Similarly, the treatment notes and objective findings by the claimant's treating therapists again only master's level providers, Mr. Thomas and Ms. Mira, from May 2022 through August 2023 also are generally markedly inconsistent with the treatment notes, diagnoses, and essentially normal objective findings by the claimant's treating psychiatrist, Dr. Pratt, and even psychiatrist Dr. Hiraldo. (Exhibits 11F/71-83; 97-102, 123-129, 135- 148, 225-230, 311-319). (Tr. at 622).

Dr. Pratt continued treating the claimant through the remainder of 2023 generally finding that she was doing well, that she denied any significant complaints, and that she was **generally essentially normal on objective examination with the only diagnoses being bipolar disorder** and continuing on the same medications that she took for the majority of the relevant period.  (Exhibit 11F/208-223, 233-248, 256-293, 295-309, 320-342, 371-388).  (Tr. at 622 (emphasis added)).

Another single psychiatric examination by Dr. Hiraldo in September 2023 also found that the claimant was essentially normal in all aspects including PHQ-2/9 scores

that were relatively low and generally markedly inconsistent with the claimant being more limited than as assessed by the residual functional capacity finding. (Exhibit 11F/351-365). (Tr. at 622). **Moreover, the treatment notes by the master's level intern at the claimant's psychiatric provider, Ms. Morgan, generally noted that the claimant had more significant complaints regarding her psychiatric symptoms that are markedly inconsistent with the contemporaneous essentially normal treatment notes and objective examination findings by the claimant's treating psychiatrist Dr. Pratt.** (Exhibits 5F/2-9; 6F/5-13; 7F/5-9; 8F/15- 21; 9F/5-10). (Tr. at 622 (emphasis added)). Similarly, Mr. Borges, although only a bachelor level social worker in September 2023 found that the claimant was progressing overall with no complaints of symptoms, as above, findings that are also generally consistent with the overall treatment by the treating psychiatrist Dr. Pratt. (Exhibit 11F/343-349). (Tr. at 622).

      **The claimant's general failure to complain of such symptoms to her treating psychiatrist, Dr. Pratt, in combination with his finding that the claimant was generally essentially normal to no more than moderate findings, vastly supersedes the complaint noted by Ms. Morgan, Mr. Thomas, and Ms. Mira, as above. also considered the other psychiatric-related record at issue.** (Exhibits 5F/2-9; 6F/5-13; 7F/5-9; 8F/2-10, 15-18, 22-26; 9F/5-10; 10F/14-18, 20-24, 30-34). (Tr. at 622–623). I fully incorporated these complaints of the claimant in the formulation of her ability to perform work as defined in the residual functional capacity finding despite the more benign findings by Dr. Pratt and the claimant's other treating psychiatric providers. (Tr. at 623).

      Limiting the claimant to the performance of following simple instructions, concentrate in two-hour increments without a break, and occasional interacting with coworkers, supervisors, and the public fully account for all reasonably demonstrated limitations as evidenced in the longitudinal evidence of record based not only on the claimant's subjective allegations and complaints, but also the objective examination findings. (Tr. at 623). **Although the claimant is limited to concentrate in two-hour increments, there is generally no evidence the claimant is more limited as alleged.** (*Id.* (emphasis added)). **There is otherwise generally nothing in the mental status examinations that demonstrates that the claimant is more limited than as assessed by the residual functional capacity finding**. (*Id.* (emphasis added)). **Despite the claimant's waxing and waning of symptoms, as noted in the PHQ-2/9 and through the subjective complaints of the claimant, I find that the claimant generally retains the same residual functional capacity finding throughout the period at issue.**[4] (*Id.* (emphasis added)). I also considered the other prior records and prior psychiatric treatment. (Exhibits *i.e.,* 1F/2-5; 2F/1-4; 4F/16-19). (Tr. at 623). I also find that the claimant's noncompliance with treatment is

---

[4]    The ALJ determined: "The treatment notes, objective examination findings, diagnoses, and prescribed medications by the claimant's treating psychiatrist throughout the entirety of the relevant period **overwhelmingly demonstrates that the claimant is generally able to perform work consistent with residual functional capacity finding despite relatively minor waxing and waning of symptoms**." (Tr. at 615 (emphasis added)).

generally not material to the outcome of this decision because she generally retained the same residual functional capacity finding despite noncompliance. (Tr. at 623). **Accordingly, mental status examinations strongly support the claimant's ability to perform work consistent with residual functional capacity finding.** (*Id.* (emphasis added)).

### B. <u>Plaintiff's Challenge to the ALJ's RFC Finding</u>.

Plaintiff argues the ALJ's RFC finding is not supported by substantial evidence because the ALJ failed to discuss Plaintiff's ability to perform "sustained work activities in an ordinary work setting on a regular and continuing bases (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent schedule)." [ECF No. 17 at 6–20 (citing SSR 96-8p)]. Moreover, Plaintiff contends the ALJ failed to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." [*Id.* (citing SSR 96-8p). Here, Plaintiff argues "the ALJ failed to properly assess the clinical findings of the claimant's long-term treating psychiatrist, Howard Pratt, D.O., as well as the totality of the evidence pertaining to the claimant's mental health conditions. In fact, the ALJ acknowledges the claimant's psychiatric hospitalization in August 2018 for suicidal attempt and ideation, but fails to properly characterize her extensive outpatient treatment thereafter." [*Id.* at 6].

Plaintiff also contends the ALJ's characterization of her mental health examinations as "essentially normal" is "unfair" because the record is "replete with clinically significant findings consistent with the claimant's allegations of disabling symptoms." [*Id.* at 7]. Plaintiff points out the ALJ altogether ignores the fact that, although Dr. Pratt consistently considered her to be "stable," "he nonetheless made medication adjustments at almost every visit, almost always in the form of an increase in dosage, suggesting the claimant required ongoing intervention in order to maintain her stability and assist her in improving her symptomology." (*Id.* at 8). Finally, Plaintiff takes issue with the ALJ's finding that she had no sustained complaints of suicidal ideation, no hallucinations, and no significant positive psychiatric objective findings, when the record reflects ongoing auditory hallucinations to the point where Plaintiff considered the voice speaking to her as a "friend." [*Id.*].

In support of her challenge to the ALJ's assessment, Plaintiff points out that Dr. Pratt treated her from September 2019 through October 2023, first diagnosing her with "generalized anxiety disorder and major depressive disorder, single episode, severe, with psychotic features" and later with "bipolar disorder, current episode, mixed, severe, with psychotic features," followed by "chronic schizophrenia." [*Id.*]. *Plaintiff then recounts the following litany of significant clinical findings the ALJ either ignored or glossed over:*

- 09/30/2019: Mental status examination during medication management visit revealed Plaintiff's anxious mood, distracted/inattentive memory/concentration, and fair judgment (Tr. 409). She was prescribed Quetiapine 200 mg (Tr. 410).
- 10/16/2019: Mental status examination during medication management visit revealed Plaintiff's anxious mood, distracted/inattentive memory/concentration, and fair insight (Tr. 406–407). **Her dosage of Quetiapine was increased** to 300 mg and Benztropine 1 mg was added (Tr. 407).
- 11/11/2019: Mental status examination during medication management visit revealed Plaintiff's elevated mood, fair insight, fair judgment, and problems with impulse control (Tr. 403). **Her dosage of Quetiapine was increased** to 400 mg and she was continued on Benztropine 1 mg (Tr. 404). Depakote 500 mg, Depakote 1,000 mg, and Zoloft 50 mg were also added to her regimen. *Id.*
- 11/18/2019: Mental status examination during medication management visit revealed Plaintiff's distracted/inattentive memory/concentration and fair insight (Tr. 400). No changes were made to her prescriptions (Tr. 401).
- 12/10/2019: **When Plaintiff presented for individual therapy, she was disheveled yet groomed within limits, and exhibited a labile affect, though she was engaging** (Tr. 398). It was recommended that she attend individual therapy for the next six months. *Id.*
- 12/13/2019: Mental status examination during medication management visit revealed Plaintiff's distracted/inattentive memory/concentration (Tr. 429). Depakote was discontinued, but she remained with prescriptions of Quetiapine 400 mg, Benztropine 1 mg, and Zoloft 50 mg (Tr. 430).
- 1/06/2020: Mental status examination during medication management visit was unremarkable (Tr. 453). However, **her dosage of Zoloft was increased** to 75 mg (Tr. 454), and the mental status examination during her individual therapy session **revealed hair loss and anxious mood** (Tr. 457). She reported her father as a major factor of her stress and anxiety, explaining that she was abused physically, emotionally, and verbally and that because of her father's abuse, she lost self-esteem and motivation to excel (Tr. 459). She felt she was deserving of low paying jobs, and **reported that her paranoia, anxiety, and inability to manage stress has affected her ability to work full or part time jobs** (Tr. 459-460). She is afraid to fight back against her father because he is older now, so she called the police to report his abusive ways and let them know she will not hurt him but will act in self-defense if he comes to attack her (Tr. 460).

- 02/04/2020: Mental status examination during individual therapy session **revealed Plaintiff's unkempt, malodorous, and poor hygiene with heavy nicotine odor and an admission she had not showered in the past four days; dysphoric mood with congruent affect; catastrophizing thought content and processes; auditory hallucinations in the form of a voice from her spiritual guide informing her that her father will pass away within the next 12 to 14 years despite the fact that he was 80 years old at the time** (Tr. 498, 500).

- 02/11/2020: Mental status examination during medication management visit was unremarkable (Tr. 494). There was no change in her prescriptions (Tr. 495).

- 02/25/2020: Mental status examination during individual therapy session **revealed Plaintiff's sullen and depressed mood; labile affect; ruminative, catastrophizing, and pessimistic thought content and processes; and fair insight** (Tr. 490). **She reported hearing a male voice at least four times a week** (Tr. 491). She also reported increased irritability, anxiety, feelings of frustration, and excessive worry (Tr. 492).

- 03/03/2020: Mental status examination during individual therapy session **revealed Plaintiff's depressed mood, labile and congruent affect, and catastrophizing and self-deprecating thought content and processes** (Tr. 485). She expressed concern over going to a doctor appointment because she was afraid they would tell her she had cancer (Tr. 487). She also reported that she did not want to shower for the appointment because it was "too much of a process to take a bath." *Id.* The therapist encouraged her to deter from foretelling and catastrophizing, and assisted Plaintiff in refraining from worry-producing thought patterns (Tr. 488).

- 04/01/2020: During medication management visit, **Plaintiff's dosage of Zoloft was increased to 100 mg** (Tr. 539). No mental status examination PHQ-9 assessment appears to have been performed. And during her medication management visit that same day, **Clonidine 0.1 mg was added to her medication regimen** (Tr. 534). **She scored a 17 on the PHQ-9 questionnaire, indicative of clinically significant symptoms, and that activities of daily living were somewhat difficult for the claimant due to her depressive symptoms** (Tr. 535). No mental status examination appears to have been performed.

- 04/08/2020: Mental status examination during individual therapy session (conducted telephonically) revealed depressed mood, catastrophizing and self-deprecating thought content and processes, and fair insight (Tr. 518). Plaintiff reported feeling stressed and frustrated regarding conflict situations that arise with her father and sometimes her brother (Tr. 521). She also described feeling overwhelmed due to financial stressors, feeling underachieved, and worries over the pandemic that were causing her severe anxiety and depression. *Id.* She admitted to hardly sleeping and feeling "on edge" with the need to have her medication adjusted but not being able to afford the blood work necessary to first check her liver functioning (Tr. 522).

- 05/11/2020: Mental status examination during medication management visit revealed fair insight, fair judgment, and problems with impulse control (Tr. 514). She was continued on Quetiapine 400 mg, Benztropine 1 mg, Clonidine 0.1 mg, and Zoloft 100 mg; and Naltrexone 50 mg was added to her regimen (Tr. 515).

- 07/06/2020: At medication management visit, Naltrexone was discontinued (Tr. 560). No mental status examination appears to have been performed.

- 08/28/2020: At medication management visit, mental status examination revealed fair insight, fair judgment, and problems with impulse control (Tr. 566). The claimant's medications remained the same as prescribed at her prior visit (Tr. 565, 567).

- 09/08/2020: During her individual therapy session, the claimant reported that her toxic relationship with her father and people judging her adherence to Santeria are the main triggers of her anxiety (Tr. 578). **She also admitted to still hearing voices and other psychotic symptoms, including depression and anxiety**. *Id.*

- 09/28/2020: At medication management visit, mental status examination revealed fair insight (Tr. 581). Clonidine was discontinued (Tr. 582).

- 10/12/2020: During her individual therapy session, **Plaintiff reported that she wakes up a lot at night and is still talking every day with the voice that she considers as a friend** (Tr. 586). **She explained that the voice prevents her from being lonely** (Tr. 588). The therapist encouraged her to challenge the voice by not considering it a friend, and to set aside an hour or two every day as a time to be depressed and then to "snap out of it" (Tr. 589).

- 11/18/2020: At medication management visit, mental status examination revealed distracted/inattentive memory/concentration and fair insight (Tr. 594). **Plaintiff was prescribed Quetiapine 600 mg, Benztropine 2 mg, and Zoloft 200 mg** (Tr. 594).

- 12/09/2020: **Plaintiff had a PHQ-9 score of 17, indicating significant depression symptoms, including fatigue, decreased concentration, restlessness, sleep disturbances, and loss of interest in activities** (Tr. 876-880). **She was assessed with clinically significant depression symptoms**, and her treatment plan included continuing Benztropine 2 mg twice a day, Quetiapine 600 mg at bedtime, and Zoloft 100 mg twice daily (Tr. 878).

- 01/29/2021: **Plaintiff's PHQ-9 score was 24, indicating significant depression symptoms** (Tr. 882-886).  She was assessed with clinically significant depression symptoms, including low energy, poor appetite, concentration issues, restlessness, hopelessness, sleep disturbances, and low self-esteem (Tr. 884).  Activities of daily living were somewhat difficult due to depression. *Id.*  She was prescribed Zoloft 100 mg twice daily, Benztropine 2 mg twice daily, and Quetiapine 600 mg at bedtime. *Id.*

- 07/26/2021: **Plaintiff's PHQ-9 score was 16, indicating symptoms of depression** such as low energy, poor appetite, concentration issues, restlessness, hopelessness, sleep disturbances, and low self-esteem (Tr. 899-904). **She was assessed with depression with clinically significant symptoms and referred to a mental health worker** (Tr. 902-903). She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, Zoloft 100 mg twice daily. Id. 09/17/2021: She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, Zoloft 100 mg twice daily (Tr. 904-908).

- 01/31/2022: Plaintiff was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, Zoloft 100 mg twice daily (Tr. 920-925).

- 03/28/2022: **Plaintiff's PHQ-9 score was 18, indicating symptoms of depression** such as low energy, poor appetite, concentration issues, restlessness, hopelessness, sleep disturbances, and low self-esteem (Tr. 925-932). **She was assessed with depression with clinically significant symptoms and referred to a mental health worker** (Tr. 929). She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, Zoloft 100 mg twice daily. Id.

- 05/11/2022: During individual therapy, Plaintiff reported doing better with medications **but still experienced auditory hallucinations, considering the voices as belonging to her "friend"** (Tr. 942). **She also reported depressed moods, anxiety, mood swings, and panic attacks three to four days weekly.** *Id.* Her main triggers included unemployment, arguing with her father, and sleeplessness. *Id.* Mental status examination showed she had fair insight and judgment and was highly motivated for change (Tr. 946). At her medication management visit that same day, she was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, Zoloft 100 mg twice daily (Tr. 964-965).

- 06/27/2022: During individual therapy, Plaintiff reported experiencing significant anxiety due to unemployment, financial issues, and a strained relationship with her father, who is violent and suffers from dementia (Tr. 968-978). She also expressed concerns about her father's aggressive behavior and her need to protect herself (Tr. 973). **She mentioned feeling anxious and depressed most days, grieving her brother's death, and having auditory hallucinations.** *Id.*

- 07/01/2022: Plaintiff was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, Zoloft 100 mg twice daily (Tr. 979).

- 08/03/2022: Plaintiff was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, Zoloft 100 mg twice daily (Tr. 993-994).

- 10/03/2022: During individual therapy, **Plaintiff reported experiencing frequent and strong bouts of anxiety, depression, and auditory hallucinations** (Tr. 994-1002). She stated she was doing better but still felt anxious and **heard voices daily** (Tr. 999).

- 10/24/2022: Plaintiff was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1035-1036).

- 02/01/2023: Plaintiff reported feeling anxious and depressed, with poor sleep, appetite, and energy (Tr. 1044-1060). **She also experienced auditory hallucinations of male voices talking to her and a sensation of ghosts around her** (Tr. 1047). Mental status examination showed labile affect and elevated mood, psychomotor agitation, and pressured speech (Tr. 1054-1055). She was not progressing and reported that her current medications were ineffective (Tr. 1057). She was advised to increase Quetiapine to 800 mg at bedtime, start Depakote 250mg twice daily, continue Zoloft 200mg daily, and continue Benztropine 2 mg twice daily (Tr. 1058).

- 02/27/2023: Plaintiff was advised to continue Benztropine 2 mg twice daily, Quetiapine 800 mg, and Zoloft 100 mg twice daily (Tr. 1074). 03/27/2023: She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1092-1093).

- 04/03/2023: During individual therapy, **Plaintiff reported experiencing depression, anxiety, mood swings, and auditory hallucinations** (Tr. 1095-1102). She found dealing with her father frustrating and feared defending herself due to his fragile skin, exacerbating her symptoms (Tr. 1101). She felt mostly no energy to do anything as she was busy caring for her elderly father. *Id.* **She was noted to struggle with depression, anxiety, mood swings, and auditory hallucinations** (Tr. 1101-1102).

- 04/27/2023: Plaintiff was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1117). 05/22/2023: She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1140).

- 06/26/2023: Plaintiff reported feeling depressed **and mentioned that the voices were not friendly** (Tr. 1144-1160). She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1160).
- 07/24/2023: Plaintiff was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1179).
- 08/21/2023: **Plaintiff reported experiencing depressed mood, anxiety, paranoia, and auditory hallucinations** (Tr. 1183). She felt depressed and anxious about three times a week (Tr. 1188.  She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1204).
- 09/25/2023: Plaintiff reported her mood as "pretty much the same" (Tr. 1221-1241). She was advised to start individual therapy and to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1235-1236).
- 10/23/2023: **Plaintiff's depression screening showed a PHQ-9 score of 24, indicating severe depression** (Tr. 1242-1260). She was advised to continue Benztropine 2 mg twice daily, Quetiapine 600 mg, and Zoloft 100 mg twice daily (Tr. 1255-1256).

(ECF No. 17 at 8–16) (cleaned up) (emphasis in bold added).

In addition to Plaintiff's complaints that the ALJ overlooked significant clinical findings regarding the severity of her mental impairments, Plaintiff also challenges the ALJ's assertion that Plaintiff "quickly improved with medication" and that her "auditory and visual hallucinations were stopped with medication."  [ECF No. 17 at 16].  The record, instead, reflects as follows:

- Immediately following her August 2019 hospitalization, on August 24, 2019, Plaintiff continued to experience auditory hallucinations that were "not milder" (Tr. 417).
- In December 2019, Plaintiff reported moderate to severe symptoms including delusions, hallucinations, anxiety, panic attacks, and severe irritability (Tr. 391-399).
- In February 2020, Plaintiff acknowledged she experiences auditory delusions at least 4 days per week (Tr. 490).
- In September 2020, Plaintiff reported experiencing symptoms of anxiety, hearing voices, olfactive hallucinations, and occasional depression (Tr. 578).
- In May 2022, despite medication, Plaintiff still experienced auditory hallucinations, considering the voices as belonging to her friend (Tr. 947).  She also reported depressed moods, anxiety, mood swings, and panic attacks 3 to 4 days weekly. *Id.*  A diagnosis of "Severe mixed bipolar I disorder with psychotic features" was noted, with symptoms continuing to affect social functioning (Tr. 954).
- In February 2023, Plaintiff experienced auditory hallucinations and a sensation of ghosts around her, and reported her current medications were ineffective (Tr. 1047). In April 2023, Marques Rodriguez reported experiencing depression, anxiety, mood swings, and auditory hallucinations (Tr. 1101).
- In August 2023, Plaintiff again reported experiencing depressed mood, anxiety, paranoia, and auditory hallucinations (Tr. 1188-1189).

- In September 2023, while one note (also by Dr. Pratt) indicated denial of perceptual disturbances (Tr. 1223), other notes from the same day explicitly stated the claimant reported experiencing depression, anxiety, panic attacks, mood swings, and auditory hallucinations (Tr. 936, 1215).

[ECF No. 17 at 16–17].

As for the ALJ's assessment that Plaintiff's PHQ-9 scores show she was "essentially normal" or "stable," the ALJ failed to discuss record evidence of "numerous high PHQ-9 scores throughout the period at issue indicating significant depression: **27** in August 2019 (Tr. 369); **24** in April 2020 (Tr. 531), January 2021 (Tr. 884), and October 2023 (Tr. 1250); **18** in March 2022 (Tr. 929); **17** in April 2020 (Tr. 535), November 2020 (Tr. 591), and December 2020 (Tr. 878); **16** in July 2021 (Tr. 902); and **13** in June 2020 (Tr. 558).  [ECF No. 17 at 18–19].  Thus, the "ALJ's emphasis on low scores and dismissive interpretations of high scores do not fully reflect the fluctuating, but often severe, nature of bipolar disorder as indicated by these objective screening tools."  [*Id.* at 19].

Finally, as for the ALJ's finding regarding Plaintiff's "highly functioning activities," Plaintiff argues the ALJ failed to address contrary record evidence that Plaintiff is essentially a hermit, afraid to leave her room, and unable to follow the plot of a television show because she is forgetful.  [ECF No. 17 at 22–23].

All in all, Plaintiff contends the ALJ cherry-picked benign clinical findings while ignoring or failing to reconcile clinically significant findings when determining Plaintiff's RFC. [ECF No. 17 at 25].  Thus, Plaintiff asks the Court to find the ALJ erred by failing to take into account the full picture of Plaintiff's mental impairments and how those impairments limit her ability to engage in full-time work.  [*Id.*].

## VI.   DISCUSSION

### A.  <u>ALJ failed to take into account the episodic nature of Plaintiff's bipolar disorder</u>.

In three recent opinions, the Eleventh Circuit squarely addressed how the Commission must treat the episodic nature of bipolar disorder when resolving disability claims. *See Schink,* 935 F.3d 1245, 1268 (11th Cir. 2019) (reversing and remanding ALJ's determination that the claimant's bipolar disorder was not a severe mental impairment at step two as unsupported by substantial evidence because the ALJ failed to consider the "episodic nature" of bipolar disorder); *Samuels v. Comm'r of Soc. Sec.,* 959 F.3d 1042, 1047 (11th Cir. 2020); and *Simon,* 7 F.4th 1094 (11th Cir. 2021).

In *Samuels*, the ALJ found the claimant's bipolar disorder to be "severe" at step two; yet, "nowhere indicated that medical evidence suggested [the claimant's] ability to work was affected by that impairment." 959 F.3d at 1047. The Eleventh Circuit further found the hypothetical posed by the ALJ to the VE "improper" because the hypothetical "did not accurately describe all the mental restrictions found for [the claimant] in the ALJ's decision." *Id.* at 1046 (cleaned up). Consequently, "the Eleventh Circuit vacated and remanded the matter to the Commissioner to "account for the episodic nature of [the claimant's] bipolar disorder in determining her RFC and whether there are jobs in the national economy that [the claimant] can perform." *Id.* at 1047.

In *Simon*, the claimant stated he was disabled due to various psychiatric conditions, including chronic depression, anxiety, and bipolar disorder. 7 F.4th at 1097. In denying disability benefits, "the ALJ gave little or no weight to three pieces of evidence in the record indicating that [the claimant's] mental illness prevents him from maintaining a job: (1) the opinions of [the claimant's] treating psychiatrist; (2) the opinions of a consulting psychologist who examined [the claimant] at the request of the SSA; and (3) [the claimant's] own testimony as to the severity of his symptoms." *Id.* Instead, the ALJ relied upon "snapshot" reports of stability and progress by treating physicians to discount the opinions of disability as being inconsistent with the medical record. *Id.* at 1106. The Eleventh Circuit repeated *Schink's* cautionary note that "people with chronic diseases can experience good and bad days," and that treatment notes indicating "only mild limitations" should not be dismissed "simply

because 'some of [the claimant's] mental-status examinations were better than others.'" *Id.* (quoting *Schink*, 935 F.3d at 1262). The Eleventh Circuit reversed, concluding "that the ALJ did not articulate adequate reasons for discounting this evidence, which provided support for a finding of disability" and remanded to the Commissioner for further proceedings. *Id.* at 1097.

In view of the full evidentiary record (including the entire procedural history of this case) and the relevant case law, the Court concludes that the Commission's determination must be reversed. This Court has not "reweigh[ed] the evidence" or found any "facts anew" in reaching this conclusion. *See Winschel*, 631 F.3d at 1178. Given the entire record here (summarized above), this Court would be nothing more than a "rubber-stamp" or an "automaton[]" were it to affirm the ALJ's decision below. See *Schink* 935 F.3d at 1257; *Simon* 7 F.4th at 1104; *MacGregor*, 786 F.2d at 1053. Explicit statements of the ALJ are directly contradicted by the record, and there is not substantial evidence to support the bottom-line findings and conclusions made.

As was true in *Samuels*, although the ALJ determined Plaintiff's mental impairments of "depression, anxiety, and bipolar disorder" were "severe" at step two, the ALJ failed to take the episodic nature of Plaintiff's bipolar disorder into account when making the RFC finding that Plaintiff had the capacity to perform light work (as a Laundry Classifier, Photocopying Machine Operator, and Marker). (*See* Tr. 626–627; Tr. at 24–25). Indeed, the overall record shows that the ALJ's decision did not appropriately consider Plaintiff's bipolar disorder, which featured prominently in her documented medical history. With respect, the ALJ did not contend with or reconcile *all* the evidence in the record and selectively chose to emphasize benign findings of some mental health examinations without considering that "people with chronic diseases can experience good days and bad days," and without "articulat[ing] adequate reasons for discounting" the significant clinical findings of Plaintiff's mental health impairments over a span of four years. *Cf. Simon,* 7 F.4th at 1106. Additionally, the ALJ found Plaintiff's chronic schizophrenia was not severe, despite record evidence of the recurrence of

28

her auditory hallucinations spanning many months.  Even if the ALJ is correct that Plaintiff's chronic schizophrenia (all by itself) is not a severe mental impairment, surely, in combination with bipolar disorder, depression, anxiety, and PTSD, the illness had more than a "minimal impact" on Plaintiff's RFC.  To state the same point within the contours of the governing statute and Eleventh Circuit precedent:  the Commission's determination that the combination of Plaintiff's diagnosed illnesses did not have more than a minimal impact on Plaintiff's RFC is not supported by substantial evidence.

The Court acknowledges the ALJ on remand greatly expanded the discussion on Plaintiff's mental health to attempt to explain the non-disability determination.  However, the ALJ still failed to sufficiently resolve conflicts in the evidentiary record that clearly support a disability finding, and the ALJ failed to build an accurate and logical bridge from all the available evidence to reach the ultimate conclusion.  Accordingly, the Court finds that the Commissioner's final decision is, once again, not based on substantial evidence.

To wrap up.  The court must determine if the Commissioner's decision is supported by substantial evidence.  "This standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'"  *Bailey v. Comm'r of Soc. Sec.,* 354 F. App'x 613, 616 (3d Cir. 2009) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)); *Rogers v. Sec'y of Health & Hum. Servs.,* 786 F.2d 1166 (6th Cir. 1986).  "The ALJ must consider not only the disabling effect of each of the appellant's ailments individually, but also the combined effect of all of the appellant's impairments."  *Wiggins v. Schweiker,* 679 F.2d 1387, 1392 (11th Cir. 1982) (citing *Ferguson v. Schweiker*, 641 F.2d 243, 250 (5th Cir. 1981); *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980); *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980)).  Here, the ALJ failed to consider the larger picture of Plaintiff's mental health treatment, and the ALJ's reliance on benign mental status findings and occasional positive notations in Dr. Pratt's notes is inadequate to properly consider the mental health treatment evidence in determining Plaintiff's RFC.  *See Henkel v. Comm'r of Soc. Sec.,* No. 20-14363-

CIV-CANNON/Maynard, 2022 WL 2012421 (S.D. Fla.  May 23, 2022)) *report and recommendation adopted*, 2022 WL 1978711 (June 6, 2022) (remanding case where ALJ failed to take into account the episodic nature of plaintiff's bipolar disorder at step two); *Draughon v. Kijakazi,* No. CV 20-4015, 2022 WL 18027885, at *7–9 (E.D. Pa. Dec. 29, 2022) (remanding case to Commissioner because the claimant's RFC was not supported by substantial evidence given that the ALJ failed to account for significant clinical findings regarding the claimant's mental health treatment).

In the case at bar, the ALJ failed to adequately account for Plaintiff's "severe" mental impairments in the RFC determination.  Specifically, the ALJ failed to account for the sporadic nature of Plaintiff's bipolar disorder.  Thus, the RFC finding is not supported by substantial evidence, requiring remand.

### B.  <u>Remand for calculation and payment of benefits is appropriate</u>.

Congress authorizes the district court to affirm, modify, or reverse the Commissioner's decision, with or without remanding for re-hearing. *See* 42 U.S.C. § 405(g).  "The standard for directing a remand for calculation of benefits is met where the record persuasively demonstrates the claimant's disability, and there is no reason to conclude that additional evidence might support the Commissioner's claim that the claimant is not disabled." *Steven C. Comm'r of Soc. Security*, 592 F. Supp. 3d 132, 140 (W.D.N.Y. 2022) (citations omitted).  "[W]here 'the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose,' the Court may reverse for calculation and payment of benefits." *Torres v. Calvin,* No. 3:16-cv-00809 (JAM), 2017 WL 1734020, * (D. Conn. May 3, 2017) (quoting *Parker*, 626 F.2d at 235); *see also Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) (reversing and remanding solely for calculation and payment of benefits); *Heckler v. Bowen*, 748 F.2d 629, 637 (11th Cir. 1984) (same).  "Further, where a claim has previously been remanded and the Commissioner has been afforded multiple opportunities to carry his burden,

remand for calculation of benefits may be appropriate." *Steven C.*, 592 F. Supp. 3d at 141 (citations omitted).

Fairness demands that the review process end at some point. The Commissioner is not entitled "to adjudicate a case 'ad infinitum' until it correctly applies the correct legal standard and gather[s] evidence to support its conclusion." *Sisco v. U.S. Dep't of Health & Hum. Servs.*, 10 F.3d 739, 746 (10th Cir. 1993); *see Seavey v. Barnhart*, 276 F.3d 1, 13 (1st Cir. 2001) (The Commissioner does not receive "endless opportunities to get it right") (citations omitted). Here, the VE testified on remand that no job exists in the national economy that a hypothetical claimant who suffered from Plaintiff's mental impairments coupled with her other limitations could perform. (Tr. at 650). That is the very definition of being "disabled" under the Act. *See Hale*, 831 F.2d at 1012 (reversing and remanding solely for calculation and payment of benefits) ("The vocational expert also testified that there are no jobs in significant numbers in the national economy that she can perform…, we hold that [the claimant] is thus disabled within the meaning of the Social Security Act and is entitled to the benefits for which she has applied").

Accordingly, the Court will not remand for further development of the record as that would serve no purpose. *See Darlene S. v. Kijakazi*, No. 1:22-CV-04265-LTW, 2023 WL 12167641, at *17 (N.D. Ga. Dec. 20, 2023) (remanding solely for calculation and payment of benefits) ("'Given the record in this case, further proceedings likely will prolong Plaintiff's ultimate receipt of benefits.'") (quoting *Rohan v. Barnhart*, 306 F. Supp. 2d 756, 771 (N.D. Ill. 2004); *accord Pavlou v. Astrue*, No. 809-CV-1456-T-30MAP, 2010 WL 3340515, at *6-7 (M.D. Fla. Aug. 6, 2010), *adopted by* 2010 WL 3340513 (M.D. Fla. August 25, 2010 ("In a number of other lengthy-delay cases, courts have determined that equitable considerations outweighed the need for further administrative adjudication….")).

Plaintiff first submitted her claim for disability in 2019; she has not worked since then, and has endured a denial, an appeal to the district court, remand, two hearings, and a subsequent second

denial.  Plaintiff is thus entitled to her benefits without further delay; again, basic fairness demands that the review process end at some realistic point.  *See Peter W. v. O'Malley*, No. 3:23-cv-00706 (JAM), 2024 WL 4343616, at *9–10 (D. Conn. Sept. 30, 2024) (where the plaintiff's claim was pending for over eight years, and the Commissioner twice requested remand for repeated legal errors, concluding that there was no purpose "to afford the Commissioner a third opportunity to apply the correct legal standard and carry his burden"); *Torres*, 2017 WL 1734020, at *4 ("Plaintiff's claim has been pending for more than seven years and was already remanded by the District Court once before.  I am not persuaded that the Commissioner deserves a third opportunity to carry her burden.") (citations omitted); *Shailer-Solak v. Berryhill*, No. 3:16-CV-1681 (VAB), 2019 WL 1284814, at *27 (D. Conn. Mar. 20, 2019) (remanding solely for calculation and payment of benefits) (citing *Torres*, 2017 WL 1734020, at *4); *Pavlou v. Astrue*, No. 8:09-cv-1456-T-30MAP, 2010 WL 3340515, at *7 (M.D. Fla. Aug. 6, 2010) (claim pending for more than eight years remanded solely for calculation and payment of benefits); *Ardito v. Barnhart*, No. 3:04-cv-1633 (MRK), 2006 WL 1662890, at *5–6 (D. Conn. May 25, 2006) ("Given the substantial time that has elapsed since the period in question concluded, and the endless iterations this case has already endured, the Court declines to remand the case to Defendant for reconsideration of Mr. Ardito's claims.") (citations omitted).

In sum, the Court finds the record persuasively demonstrates disability, and there is no reason to conclude that additional evidence would support a finding that Plaintiff is not disabled.  The two underlying determinations of the Commission failed to reconcile clear evidence of disability, and another remand for factfinding will not alter the Eleventh Circuit's recognition of the realities of diagnosed bipolar disorder (present here) and how they should be treated in connection with this determination.  Remand for calculation and payment of benefits in this case is therefore warranted. *See Steficek v. Barnhart*, 462 F. Supp. 2d 415, 421 (W.D.N.Y. 2006); *see also Torres*, 2017 WL 1734020, at *4 ("Plaintiff's claim has been pending for more than seven years and was already remanded by the

District Court once before. I am not persuaded that the Commissioner deserves a third opportunity to carry her burden.")).  The factual record before the Court—which spans over 1,260 pages in length—is already comprehensive, and there is no reason to believe that the record would benefit from any further development.  Both the March 2019 and May 2023 written determinations assessed an RFC failed to take into account the essential sporadic nature of Plaintiff's "severe" mental impairment—bipolar disorder.  (*See* Tr. at 20; Tr.at 614). *See Bobby R. v. Comm'r of Soc. Sec.*, No. 5:23-cv-00590 (MAD/ML), 2024 WL 3735876, at *10 (N.D.N.Y. July 8, 2024) (explaining that while remand for calculation and payment of benefits is "generally disfavored" remand is allowed where "multiple hearings provide persuasive proof of disability and show that further development of the record would not serve any useful purpose") (citing SSR 96-9p).  Accordingly, the Court finds "the record provides persuasive proof of disability" and remands this case for the sole purpose of "calculation and payment of benefits." *Parker,* 626 F.2d at 235.

### VII.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Plaintiff's Motion for Summary Judgment **[ECF No. 17]** is **GRANTED**.

2.  Defendant's Motion for Summary Judgment **[ECF No. 21]** is **DENIED**.

3.  Defendant's final administrative decision is **REVERSED AND REMANDED** to the Commissioner solely for the purpose of calculation and payment of benefits.

4.  The Court will enter a separate final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**DONE AND ORDERED** in the Southern District of Florida this November 17, 2025.

DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record